GRACE H. CUNNINGHAM, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

EUGENE F. CUNNINGHAM AND GRACE H. CUNNINGHAM, HUSBAND AND WIFE, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 55090, 55091.   Filed June 17, 1957.

*Raymond D. Ogden, Esq.*, for the petitioners.
*John H. Welch, Esq.*, for the respondent.

ATKINS, *Judge:* The respondent determined deficiencies in income tax for the years 1946 and 1952 in the respective amounts of $6,725.59 and $9,528.54. The question presented for decision is whether any amount should be included in gross income of the petitioners in either 1946 or 1952, on account of improvements constructed in 1946 by a lessee under a 6-year lease expiring in 1952, and, if so, the amount to be included.

### FINDINGS OF FACT.

Some of the facts are stipulated and are so found, the stipulation being incorporated herein by this reference.

The petitioners are husband and wife residing in Seattle, Washington. The petitioner Grace H. Cunningham filed her income tax return for the year 1946 with the collector of internal revenue at Tacoma, Washington. The two petitioners filed a joint income tax return for the year 1952 with the director of internal revenue at Tacoma, Washington. Hereinafter the term petitioner refers to the petitioner Grace H. Cunningham.[1]

The petitioner in 1928 started a steel-manufacturing enterprise which was incorporated in 1936 as the American Manufacturing Company, Inc. She has continuously been one of the principal owners of the stock and its general manager and financial backer. Her brother, T. M. Gepford, has been and now is president and executive head of the company. Her husband, the petitioner Eugene F. Cunningham, has been vice president and a member of the board of directors. The company is in the business of manufacturing heavy machinery.

The property of the American Manufacturing Company is situated in block 2103 of the Tacoma Land Company's Fifth Addition in the City of Tacoma. Immediately to the east of such property, and separated therefrom by an alley 40 feet in width, are situated lots 7 to 12, inclusive, of block 2102, which in 1936 were owned by Martin A. and Mary E. Petrich. At that time those lots were not level, in some places being as much as 30 to 40 feet below grade, and had little usable surface. For many years they had constituted a dumping ground for rubbish and scrap. In 1936 American Manufacturing Company under an oral agreement with the owners acquired the right to use those lots for open storage of steel and other materials and to make such fills thereon as might be necessary. By 1943 or 1944 the lots had been filled so as to become usable over their entire area. The American Manu-

---

[1] In 1946 the petitioner Grace H. Cunningham held certain lots involved herein as her sole and separate property, but at some time prior to January 1, 1952, such lots, except one which had been sold, were converted to community property by proper instruments of conveyance.

facturing Company did not, up to that time, pay any rent or taxes thereon. For a portion of 1943 it paid $10 per month for the use of lots 8 to 12 under an oral agreement, after having installed an annealing oven on a portion of lots 8 to 12. The American Manufacturing Company agreed at that time to remove the annealing oven as soon as its use was terminated.

In 1943 the American Manufacturing Company erected a craneway on lot 9 of block 2102 to be used for the moving of heavy equipment. The dimensions of lot 9 are 25 feet by 120 feet. A slab of cement 25 feet in width and approximately 60 feet in length was laid down and the craneway was then erected of wood with columns running the full length of 120 feet.

The company was still in need of additional working space for steel-cutting equipment. In October 1944 the company owed a bank $41,000. At January 1, 1946, it owed banks about $172,000 and Cunningham Steel Foundry (owned by the petitioner Eugene F. Cunningham) $25,000. At the end of 1946 it owed banks about $184,000. The petitioner was endorser and guarantor of the bank loans.

On October 26, 1944, the petitioner purchased lots 7 to 12 of block 2102 at a price of $8,000. At that time the American Manufacturing Company was expanding rapidly. Immediately following the purchase of the property by the petitioner, the American Manufacturing Company at its own cost placed an adequate roof over the superstructure of the craneway and also enclosed the entire south side of the craneway, 120 feet, with large windows supported by hollow cement tile blocks. This constituted the cheapest type of construction permitted by the building code of the City of Tacoma.

In November 1945 the petitioner Eugene F. Cunningham desired to erect a warehouse building on lots 4, 5, and 6 of block 2102. The petitioner Grace H. Cunningham had no interest in such lots nor in the building to be constructed thereon. Petitioner Eugene F. Cunningham needed more area for the contemplated building and purchased lot 7 of block 2102 from the petitioner for $1,333.33. He then erected a cement warehouse building 120 feet long and 100 feet wide, known as the Graybar Building, which was ready for occupancy by May 1946. The southerly wall of the building constituted the dividing line between lots 7 and 8.

The petitioner, being the largest stockholder and manager of American Manufacturing Company, was desirous of permitting the company to expand its business and obtain the necessary room by changing the craneway into a complete structure. In the latter part of December 1945 she entered into an oral lease with the American Manufacturing Company covering lots 8 to 12 of block 2102. It was agreed that the American Manufacturing Company could use lot 8

which adjoined the Graybar Building and lot 9 for the purpose of enclosing both lots 8 and 9 as one large area 50 feet by 120 feet, this to be done by closing the two 50-foot ends by use of large doors and using the south wall of the Graybar Building as the north wall of the enclosure. The terms of this oral lease are substantially set forth in the minutes of a meeting of the board of directors of the American Manufacturing Company held on December 15, 1945. Such minutes contain the following:

The President also announced that said Grace H. Cunningham was desirous of leasing said property to the American Manufacturing Company, Inc. on the following basis:

That the American Manufacturing Company would construct a building on said property at its own expense; would pay all the taxes, and at the end of a six year period, said lease would be terminated and the building on the property would revert to the owner of the real property, Grace H. Cunningham. That there would be no rent paid for said lease but that the consideration for the lease was the transfer of the building to Grace H. Cunningham at the end of the term of the lease. Therefore, after full discussion having been had, the following resolution was unanimously adopted:

"BE IT RESOLVED, that the proper officers of the American Manufacturing Company, Inc. be instructed to prepare the proper instruments to lease from Grace H. Cunningham, Lots 8, 9, 10, 11 and 12, Block 2102, Tacoma Land Company, Fifth Addition, Tacoma, Washington, for a period of six years commencing with the 2nd day of January, 1946. That the terms and conditions of said lease be such that the consideration for said lease would be the transfer of any and all interests that the American Manufacturing Company, Inc. had in the building to be constructed on the premises to be transferred to Grace H. Cunningham. That American Manufacturing Company, Inc. would immediately commence construction of a building on said premises of the approximate value of $25,000.00. That the proper officers of the American Manufacturing Company, Inc. also be instructed to pay the taxes on said property for the term of the lease."

The lease was later reduced to writing in a written lease dated March 17, 1947. Such lease provides for a term of 6 years from January 2, 1946, to January 2, 1952. Therein it is recited:

The consideration for said lease being that the lessee will pay taxes on the above described property for a period of six years and will transfer, at the end of the period of the lease, all right, title and interest which said lessee has in a building which lessee has constructed and paid for on the above described property.

* * * * * * *

And at the expiration of said term, the said lessee will quit and surrender the said premises in good state and condition as they now are (ordinary wear and damage by the elements or fire excepted).

Prior to January 1, 1946, the American Manufacturing Company had expended $2,800 for roofing of the craneway on lot 9 and the enclosure of the south wall with hollow tile and glass windows, and $2,755 for grading and paving the alley. Subsequent to the effective date of the lease, January 2, 1946, the American Manufacturing Com-

pany expended $11,097 as cost of improvements which, pursuant to the lease, were to revert to the petitioner at the end of the lease period. Another craneway was built located on lot 8, next to the Graybar Building, a floor was laid, a roof was constructed over lot 8 (resulting in a roof over both lots 8 and 9), and doors were installed at the ends of the structure located on both lots 8 and 9. The improvements placed upon the property by the American Manufacturing Company which under the terms of the lease were to revert to the petitioner are improvements attached to the realty.

On March 29, 1946, the petitioner Eugene F. Cunningham, as first party, and the petitioner and the American Manufacturing Company, Inc., as second parties, entered into a party wall agreement. It was therein recited that the parties are the owners of adjoining pieces of property. Therein it was agreed that the south wall of the Graybar Building should be thereafter the common property of the parties to the agreement and that the covenants contained in the agreement should run with the land. Since the Graybar Building was not as tall as the building on the petitioner's lots, it was necessary to extend the height of the wall by several feet. The party wall was completed in 1946 at some time prior to the execution of the party wall agreement on March 29, 1946. The American Manufacturing Company paid an amount of $4,734 in connection with the party wall. The party wall agreement was made as a part of or in connection with the oral lease.

On January 2, 1952, the American Manufacturing Company released all right, title, and interest in and to the improvements, to the petitioner. This release did not change or purport to change the rights of the parties under the party wall agreement.

On January 14, 1952, the petitioners, as husband and wife and as a community, executed a new lease with the American Manufacturing Company covering lots 8 and 9 and the east 40 feet of lot 10 in block 2102, together with improvements for a period of 10 years from and after January 1, 1952. The lessee agreed to pay $10 per month and all taxes of every kind against the property and any and all other expenses of any kind or character incident to the occupation or maintenance of the premises. The lessee agreed that any additions or repairs or improvements placed upon the building should, at the expiration of the lease, become the property of the lessors. It further agreed to keep the building fully insured in an amount satisfactory to the lessors.

Since January 1, 1952, the American Manufacturing Company has paid rent of $10 per month, together with taxes, for lots 8 and 9 and the east 40 feet of lot 10 of block 2102.

The only specified cash rent as such that was ever paid up to January 1, 1952, for the use of any part of the properties was $10 per month for a portion of the year 1943, which was prior to the time the petitioner purchased lots 8 to 12.

The American Manufacturing Company capitalized the total cost of improvements on these lots at $21,904.33 on its books and corporation income tax returns, and claimed a depreciation deduction of one-sixth of that amount in each of the taxable years 1946 to 1951, inclusive.

The assessed valuation of the lots, exclusive of improvements, as determined by the county assessor for the various years involved in the first lease period was $2,800 and the average rate of taxation during such period was roughly 6.5 per cent. The average annual tax during such period, exclusive of improvements, was $182. The taxes on lots 8 to 12, inclusive, including improvements, for the years 1946 to 1950, were as follows:

| | |
|---|---|
| 1946, paid in 1947 | $218.11 |
| 1947, paid in 1948 | 677.11 |
| 1948, paid in 1949 | 588.46 |
| 1949, paid in 1950 | 689.63 |
| 1950, paid in 1951 | 620.71 |

The annual cost of insurance was $66.66. The policy does not protect the petitioner nor does she carry insurance on the property.

In determining the deficiency for the year 1946 the respondent added to reported taxable income the amount of $14,714.60 as rental income, stating that "the cost of improvements placed in 1946 upon Lots 8, 9, 10, 11 and 12 * * * constituted taxable income to you in 1946 as lessor, to the extent of the fair market value subject to the lease, of such improvements, which, pursuant to the lease instrument, was to revert to you at the end of the six year term." His computation of the amount of $14,714.60 was as follows:

| | |
|---|---|
| Cost of improvements—1946 | $21,904.33 |
| Less: Depreciation for 6-year term of lease at 2½% per year | 3,285.66 |
| | |
| Depreciated or adjusted basis Jan. 2, 1952 | 18,618.67 |
| Present value of $1 payable at end of 6 years at 4% | .790314 |
| | |
| Fair market value of improvements Jan. 2, 1946 | 14,714.60 |

In determining the deficiency for the year 1952 the respondent added to reported taxable income the amount of $18,071.06 as rental income, stating that "the cost of improvements * * * constituted taxable income to you in 1952 as lessor, to the extent of the fair market value of such improvements, which, pursuant to the lease instrument, reverted to you at the end of the six year term." The amount of $18,071.06 was computed by the respondent as follows:

Cost of improvements—1946_____ $21, 904. 33
Less: Depreciation for 6-year term of lease at 2½% per year_____ 3, 285. 66

Fair market value of improvements Jan. 2, 1952_____ 18, 618. 67
Less: Depreciation for 1952 on above improvements_____ 547. 61

Increase in income_____ 18, 071. 06

Included in the above cost of $21,904.33 is the amount of $4,734 paid by the American Manufacturing Company to constitute the south wall of the Graybar Building, a party wall. Also included is the amount of $2,755, the cost of construction and hard-surfacing of the alley. This $2,755 does not constitute a proper part of the cost of the building.

The parties to the lease did not intend that the value of the improvements made by the lessee should, and it did not, represent, in whole or in part, rent at the time of construction or at the termination of the lease.

OPINION.

The question presented for decision is whether income was derived either by the petitioner Grace H. Cunningham in 1946 when the lessee, American Manufacturing Company, made improvements on her property, or by her and her husband, the petitioner Eugene F. Cunningham, on account thereof in 1952 at the termination of the lease, at which time the property was held as community property. There is not before us for decision any question as to whether taxable income was derived by the petitioners as a result of other requirements of the lease such as the payment by the lessee of taxes on the property.

The respondent concedes that in determining deficiencies for both 1946 and 1952 he has acted inconsistently and that income was derived in only one year, contending primarily that the proper year was 1946, but in the alternative that income was derived in 1952.

The petitioners contend that under the circumstances here presented no income was derived in either year. Alternatively, they contend that income could have been derived only in 1952 and that the amount of income has been erroneously computed.

We are concerned with section 22 (a) and (b) (11) of the Internal Revenue Code of 1939. Section 22 (a) provides:

GENERAL DEFINITION.—"Gross income" includes gains, profits, and income derived from salaries, wages, or compensation for personal service (including personal service as an officer or employee of a State, or any political subdivision thereof, or any agency or instrumentality of any one or more of the foregoing), of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. * * *

Section 22 (b) (11) provides:

EXCLUSIONS FROM GROSS INCOME.—The following items shall not be included in gross income and shall be exempt from taxation under this chapter:

\*          \*          \*          \*          \*          \*          \*

IMPROVEMENTS BY LESSEE ON LESSOR'S PROPERTY.—Income, other than rent, derived by a lessor of real property upon the termination of a lease, representing the value of such property attributable to buildings erected or other improvements made by the lessee.

The question of whether and when a lessor derives taxable income as a result of improvements made by a lessee has, through the years, been a troublesome one and has been the subject of much litigation and also of legislation. A brief discussion of the historical background is helpful.

In *M. E. Blatt Co.* v. *United States*, 305 U. S. 267 (1938), the owner of real estate leased the property in 1930 for use as a moving picture theater for a term of 10 years, beginning upon completion of improvements to be made. The lessor agreed to make certain alterations and the lessee agreed to install the latest type of moving picture apparatus and other furniture and equipment necessary for the successful operation of a modern theater, to become the property of the lessor at the expiration, or sooner termination, of the lease. The lessee agreed to pay for certain of the improvements. The Commissioner added to the taxpayer's income for the first year of the lease one-tenth of the estimated depreciated value at the termination of the lease of the alterations and improvements paid for by the lessee. The Supreme Court held that no income was derived in such year either as rental or otherwise, stating in part:

There is nothing in the findings to suggest that cost of any improvement made by lessee was rent or an expenditure not properly to be attributed to its capital or maintenance account as distinguished from operating expense. While the lease required it to make improvements necessary for successful operation, no item was specified, nor the time or amount of any expenditure. The requirement was one making for success of the business to be done on the leased premises. It well may have been deemed by lessor essential or appropriate to secure payment of the rent stipulated in the lease. Even when required, improvements by lessee will not be deemed rent unless intention that they shall be is plainly disclosed. Rent is "a fixed sum, or property amounting to a fixed sum, to be paid at stated times for the use of property \* \* \*; it does not include payments, uncertain both as to amount and time, made for the cost of improvements \* \* \*." The facts found are clearly not sufficient to sustain the lower court's holding to the effect that the making of improvements by lessee was payment of rent.

It remains to be considered whether the amount in question represented taxable income, other than rent, in the first year of the term.

\*          \*          \*          \*          \*          \*          \*

Granting that the improvements increased the value of the building, that enhancement is not realized income of lessor. So far as concerns taxable income, the value of the improvements is not distinguishable from excess, if any there may be, of value over cost of improvements made by lessor. Each was an addition

678

to capital; not income within the meaning of the statute. Treasury Regulations can add nothing to income as defined by Congress.

But, assuming that at some time value of the improvements would be income of lessor, it can not be reasonably assigned to the year in which they were installed. The commissioner found that at the end of the term some would be worthless and excluded them. He also excluded depreciation of other items. These exclusions imply that elements which will not outlast lessee's right to use are not at any time income of lessor. The inclusion of the remaining value is to hold that petitioner's right to have them as a part of the building at expiration of lease constitutes income in the first year of the term in an amount equal to their estimated value at the end of the term without any deduction to obtain present worth as of date of installation. It may be assumed that, subject to the lease, lessor became owner of the improvements at the time they were made. But it had no right to use or dispose of them during the term. Mere acquisition of that sort did not amount to contemporaneous realization of gain within the meaning of the statute.

In *Helvering* v. *Bruun*, 309 U. S. 461 (1940), the taxpayer as owner had in 1915 leased land and a building thereon for a term of 99 years. The lessee had the right under certain conditions to remove buildings, provided that no building should be removed or torn down after the lease became forfeited or during the last 3½ years of the term. The lessee was to surrender the land, upon termination of the lease, with all buildings and improvements thereon. In 1929 the lessee removed the existing building and constructed a new one. In 1933 the lease was canceled for default and the lessor regained possession of the land and building. The Commissioner determined that in 1933 the taxpayer realized a net gain in the amount of the net fair market value of the new building. In that case the Supreme Court upheld that determination, stating in part:

The course of administrative practice and judicial decision in respect of the question presented has not been uniform. In 1917 the Treasury ruled that the adjusted value of improvements installed upon leased premises is income to the lessor upon the termination of the lease. The ruling was incorporated in two succeeding editions of the Treasury Regulations. In 1919 the Circuit Court of Appeals for the Ninth Circuit held in *Miller* v. *Gearin*, 258 F. 225, that the regulation was invalid as the gain, if taxable at all, must be taxed as of the year when the improvements were completed.

The regulations were accordingly amended to impose a tax upon the gain in the year of completion of the improvements, measured by their anticipated value at the termination of the lease and discounted for the duration of the lease. Subsequently the regulations permitted the lessor to spread the depreciated value of the improvements over the remaining life of the lease, reporting an aliquot part each year, with provision that, upon premature termination, a tax should be imposed upon the excess of the then value of the improvements over the amount theretofore returned.

In 1935 the Circuit Court of Appeals for the Second Circuit decided in *Hewitt Realty Co.* v. *Commissioner*, 76 F. 2d 880 * * * that a landlord received no taxable income in a year, during the term of the lease, in which his tenant erected a building on the leased land. The court, while recognizing that the lessor need not receive money to be taxable, based its decision that no taxable gain was realized in that case on the fact that the improvement was not portable or detach-

able from the land, and if removed would be worthless except as bricks, iron, and mortar. * * *

This decision invalidated the regulations then in force.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

The circumstances of the instant case differentiate it from the *Blatt* and *Hewitt* cases; but the petitioner's [Commissioner's] contention that gain was realized when the respondent [the taxpayer], through forfeiture of the lease, obtained untrammeled title, possession and control of the premises, with the added increment of value added by the new building, runs counter to the decision in the *Miller* case and to the reasoning in the *Hewitt* case.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

We hold that the petitioner was right in assessing the gain as realized in 1933.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

The respondent can not successfully contend that the definition of gross income in Sec. 22 (a) of the Revenue Act of 1932 is not broad enough to embrace the gain in question. That definition follows closely the Sixteenth Amendment. * * *

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

Here, as a result of a business transaction, the respondent received back his land with a new building on it, which added an ascertainable amount to its value. It is not necessary to recognition of taxable gain that he should be able to sever the improvement begetting the gain from his original capital. * * *

After the Supreme Court's decision in the *Bruun* case there remained no question that the value of improvements made by a lessee constituted taxable income to the lessor, under the broad definition of income contained in section 22 (a), at the date of termination of the lease. *Lewis* v. *Pope Estate Co.*, (C. A. 9, 1940) 116 F. 2d 328, certiorari denied 314 U. S. 630; *Greenwood Packing Plant* v. *Commissioner*, (C. A. 4, 1942) 131 F. 2d 787; and *Trask* v. *Hoey*, (C. A. 2, 1949) 177 F. 2d 940.[2]

Thereafter, however, Congress, by section 101 of the Revenue Act of 1942, enacted section 22 (b) (11), quoted hereinabove, to modify the effect of the *Bruun* case by limiting the recognition of income on termination of the lease to that which constituted rent.[3]

---

[2] Treasury Decision 4980, 1940–2 C. B. 42, was promulgated on July 2, 1940, amending section 19.22 (a)–13 of Regulations 103 to read in part as follows:

Improvements by lessee.—If buildings are erected or other improvements are made by a lessee, the lessor shall include in gross income as of the date he acquires possession or control of the real estate with such improvements thereon, at the termination of the lease by forfeiture or otherwise, an amount equal to the excess of the value as of such date of the real estate with such improvements thereon over the value as of such date of the real estate without such improvements.

[3] The Ways and Means Committee Report (H. Rept. No. 2333, 77th Cong., 2d Sess.) and the Finance Committee Report (S. Rept. No. 1631, 77th Cong., 2d Sess.), state as follows, 1942–2 C. B. 425:

In *Helvering* v. *Bruun* (309 U. S. 461, (1940) * * *) it was held that buildings or other improvements made by a lessee constitute income to a lessor to the extent of the value of such improvements at the time the lease is forfeited and the lessor secures control and possession of the property. Your committee believes it advisable to exclude (except in cases in which such improvements represent a liquidation in kind of lease rentals) from the gross income of the lessor income attributable to such improvements. Such exclusion from gross income of the lessor does not mean that the enhancement in value in the hands of the lessor will not be ultimately taxed. By reason of the fact that the gross income attributable to the value of the improvements is not recognized, the basis of the property in the hands of the lessor will not be increased by such item.

The Revenue Act of 1942 also added subsection (c) to section 113 of the Internal Revenue Code to provide that the basis of real property should not be increased or diminished on account of income derived by a lessor and excludible from gross income under section 22 (b) (11).

Section 29.22 (b) (11)–1 of Regulations 111, promulgated under section 22 (b) (11) of the 1939 Code, as amended, provides in part:

SEC. 29.22 (b) (11)–1. EXCLUSION FROM GROSS INCOME OF LESSOR OF REAL PROPERTY OF VALUE OF IMPROVEMENTS ERECTED BY LESSEE.—Income derived by a lessor of real property upon the termination, through forfeiture or otherwise, of the lease of such property and attributable to buildings erected or other improvements made by the lessee upon the leased property is excluded from gross income. However, where the facts disclose that such buildings or improvements represent in whole or in part a liquidation in kind of lease rentals, the exclusion from gross income shall not apply to the extent that such buildings or improvements represent such liquidation. The exclusion applies only with respect to the income realized by the lessor upon the termination of the lease and has no application to income, if any, in the form of rent, which may be derived by a lessor during the period of the lease and attributable to buildings erected or other improvements made by the lessee. * * *

Such regulations, including an example set forth therein, clearly indicate that neither at the termination of a lease nor at any time during the period of the lease does a lessor derive taxable income as a result of improvements upon leased premises, unless the income attributable to them constitutes rental income. On the other hand regulations do in effect provide that taxable income may be derived by a lessor on account of improvements by the lessee during the period of the lease if any such income represents rental. It is apparently upon the basis of this regulation that the respondent makes his principal contention that the petitioner in the instant case derived income in 1946 from the construction of the improvements. The petitioner argues strongly that under the authorities set forth hereinabove a lessor may not be considered as deriving income prior to termination of the lease, whether as rent or otherwise.

In the view we take of the instant case, we find it unnecessary to decide that question. It is clear that neither the statute nor the regulations purport to treat as taxable income to the lessor at any time the value of improvements unless such value represents rent.

In *M. E. Blatt Co.* v. *United States, supra,* the Supreme Court has clearly stated that whether the value of such improvements constitutes rent depends upon the intention of the parties, and that even when the improvements are required by the terms of the lease this value will not be deemed rent unless the intention that it shall be such is plainly disclosed. Such intent in our opinion is to be derived not only from the terms of the lease but from the surrounding circumstances. This is recognized by the respondent in his published ruling I. T. 4009, 1950–1 C. B. 13.

In the instant case, while the lease, both in its oral and written form, provides that the consideration for the lease was to be in part the transfer, at the end of the term of the lease, of the building to the petitioner, we note that the contemporaneous construction of the lease by the directors, as shown in their minutes, is that there would be no rent paid for the lease. Consistently, the company, as lessee, did not treat the cost of the improvements as rental, but treated such cost on its books and in its income tax returns as a capital outlay and amortized it over the term of the lease.

The petitioner Grace H. Cunningham in 1928 started the steel-manufacturing enterprise which was incorporated in 1936 as the American Manufacturing Company, Inc. She was one of the principal stockholders, and its manager and financial backer, and had endorsed and guaranteed its bank loans, amounting at one time to about $184,000. Her brother was president and her husband, Eugene F. Cunningham, was vice president. At the time the petitioner purchased the land and entered into the lease, the company was in dire need of room for expansion. It had previously used the lots for outdoor storage without paying rental to the prior owners, except a nominal rental for a portion of the year 1943. After the petitioner acquired the property and before the oral lease was entered into, the company placed a roof over the craneway and enclosed one side thereof. After the date of the lease it continued to make other improvements to this structure as described in the Findings of Fact.

The petitioner testified that the reason she bought the lots and leased them to the company was in order that her company would have working space in that locality and not be forced to move, and that she had no intention of charging rent. She stated that the company was to use the lots for nothing, provided it paid the taxes. She also testified that she considered the improvements to be of a special type of construction to meet the particular need of the business of the company, that they did not have any value to anyone else except someone in a similar manufacturing business and that there was no other company in the city doing similar manufacturing. She stated that as the property owner she did not consider that the improvements had any value and that if she had not been connected with the company she would have required an agreement on the part of the lessee to remove the improvements. The petitioner Eugene F. Cunningham testified that in 1945 the company was not in a financial position to buy the lots. When the lease terminated in 1952 and title to the improvements was acquired by the petitioners, they entered into a new written lease with the company covering substantially the same properties for a period of 10 years at an agreed rental of $10 per month, the lessee to pay all taxes and maintenance and any new

improvements to become the property of the lessors at the end of the term.

We are satisfied from this testimony and from the acts of the parties to the lease that they did not intend that the value of the improvements should constitute rent either at the time of construction or at the termination of the lease. We have therefore concluded and found as a fact that the value of such improvements made by the lessee did not represent rent at the time of construction or upon termination of the lease. It follows that the petitioners did not derive income attributable to such improvements either in 1946 or in 1952.

*Decision will be entered for the petitioners.*